**Reversed, Remanded, and Opinion Filed December 13, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00506-CV

### IN THE INTEREST OF C.V.L., A CHILD

**On Appeal from the 304th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-17-01086-W**

## OPINION

Before Justices Whitehill, Partida-Kipness, and Pedersen, III
Opinion by Justice Partida-Kipness

Father appeals the trial court's decree terminating his parental rights to his daughter, C.V.L. In two issues, Father argues the evidence was legally and factually insufficient (1) to support termination of his parental rights under sections 161.001(b)(1)(D) and 161.001(b)(1)(E) of the Texas Family Code and (2) to support the trial court's finding that termination was in the child's best interest. For the reasons that follow, we reverse the portion of the decree that terminated Father's parental rights to C.V.L., reverse the portion of the decree appointing the Department as the permanent managing conservator of C.V.L., and remand the case to the trial court for a new trial.

## Background

C.V.L. is a female child born August 15, 2016. D.N.H. is her mother, and C.L.L. is her father. The Texas Department of Child Protective Services ("the Department") received a referral

when C.V.L. was born because Mother tested positive for cocaine twice prenatally and then her meconium was positive for cocaine at birth. But the Department did not remove C.V.L. at that time. Instead, the Department instituted a safety plan that required C.V.L. to be left with Father, required Mother to have only supervised visitation with C.V.L., and prohibited Mother from living with Father and C.V.L.

## I.    The 2017 Referrals

In August 2017, the Department received another referral due to concerns regarding the child's living environment. Specifically, the referral raised concerns that the living environment had mold, dirty dishes, and fleas, and that Mother was using drugs. Father denied that Mother was living in the house but admitted that Mother would sometimes spend the night. Father's drug test came back negative at that time, but Mother's was positive for methamphetamines and other drugs. The Department received a re-referral alleging that both parents were using methadone and Mother was stealing grandfather's diabetic needles to shoot up drugs. Father's October 2017 hair drug test was positive for methamphetamines. Father declined placement options, and the child was removed from Father's possession. Mother admitted she used methamphetamines, but Father did not admit using methamphetamines. The Department filed the underlying lawsuit in October 2017 seeking termination of the parental rights of both Mother and Father.

Father submitted to a psychological evaluation on November 20, 2017. LifeSmart Therapy Institute conducted the evaluation of Father's current psychological functioning as requested by the Department. During that evaluation, Father reported that he failed a drug test in October 2017 and tested positive for methamphetamine, but denied ever using the drug. He claimed that Mother admitted to drugging him without his knowledge, and that is why he failed the drug test. He also admitted that he allowed Mother to live with him and C.V.L. when it seemed like Mother was not using drugs.

In December 2017, the trial court issued temporary orders that included services for Father to complete. The services ordered included parenting classes, drug treatment, and counseling. Father completed the parenting classes. He completed the counseling through LifeSmart and received a successful discharge from that counselor. He participated in drug treatment through Restoring Lives and also received a successful discharge from that treatment. Following Father's negative drug tests in January 2018, March 2018, and May 2018, those providers recommended that C.V.L. be put back in the home with Father. At that time, however, the Department remained concerned about Mother because she was not cooperating, not submitting to drug tests, and not completing services.

## II.     The 2018 Monitored Return

On June 29, 2018, the parties mediated the underlying case and implemented a Mediated Settlement Agreement under which the parties agreed to a monitored return of C.V.L. to Father. During the monitoring period, Father agreed to continue to participate in random drug testing as requested for and paid for by the Department, to maintain his residence in a sanitary and safe manner, and to allow the Department, the guardian ad litem, and the Court Appointed Special Advocate (CASA) representative to have announced and unannounced visits with the child in the home. Father also agreed that Mother would have no visitation until she submitted to a hair strand drug test as arranged and paid for by the Department. C.V.L. was placed in the home with Father for a six–month monitored return on June 29, 2018.

## III.     The 2018 and 2019 Drug Test Results

Father submitted to urinalysis drug tests on July 19, 2018 and August 15, 2018, both of which returned negative results. A random drug test performed on Father's hair follicles on September 25, 2018, however, returned a positive result for amphetamines and

methamphetamines. In response, the Department removed C.V.L. from Father's care on October 9, 2018 and placed her in a foster home.

After the removal, Father submitted to random drug tests on October 23, 2018, November 27, 2018, December 13, 2018, January 3, 2019, and February 21, 2019.  The October 23, 2018 test was a toenail analysis that was positive for amphetamines, methamphetamines, cannabinoids, and carboxy-THC. The November 2018, December 2018, and January 2019 tests were urine analyses that came back with negative results. The February 2019 hair test was also negative. Father obtained a toenail analysis on March 5, 2019, which was positive for methamphetamine.

## IV.      Father's Counseling and Treatment

After removing C.V.L. from Father's care in October 2018, the Department ordered Father to undergo drug treatment. Shetara Bonds, the caseworker assigned to C.V.L.'s case, referred Father to Metrocare Services ("Metrocare") for treatment.  The Metrocare patient records show that Father presented to Metrocare for drug rehabilitation counseling as ordered by the court on November 16, 2018 as part of custody proceedings. Later medical records show that Father denied drug use and refused psychiatric medications to treat bipolar II disorder at a December 14, 2018 follow-up appointment but agreed to participate in counseling.

Through Metrocare, Father participated in substance abuse counseling through an Intensive Outpatient Program (IOP) and a Supportive Outpatient Program (SOP). Metrocare discharged Father from both programs on April 1, 2019 because he completed the program and made sufficient growth. On discharge, Metrocare recommended that Father attend Alcoholics Anonymous meetings twice a week for six months, identify ten triggers that could lead to a relapse within forty-five days, and identify and list three positive people in his support system within forty-five days. The discharge notes show a diagnosis of "Amphetamine-type substance abuse disorder. Moderate" and "Alcohol use disorder. Moderate"

## V.       The Trial

After passing all four drug tests between November 2018 and February 2019, Father filed a motion for return of child to his possession. Father waived his right to a jury trial and, on April 9, 2019, the case proceeded to a bench trial on Father's motion and the Department's petition to terminate Father's and Mother's parental rights. Father and the following witnesses testified at trial: Katurah Boyce, the Department's investigation supervisor; Chris Turnage, Toxicologist and Managing Director of Forensic DNA and Drug Testing Services; Shetara Bonds, the Department caseworker assigned to C.V.L.'s case from December 2017 through March 2018; John Parker, a friend of Father and potential caregiver for C.V.L.; Lorrie Al-Bohi, C.V.L.'s babysitter; Ronald Aland, guardian ad litem; and the CASA representative.

Boyce provided background information concerning the events leading to the filing of the lawsuit in October 2017. Her last involvement with Father was after the fourteen-day hearing held following the filing of the lawsuit.

Father testified at length. He told the court that he and Mother were together for seven years before conceiving C.V.L. He thought Mother had stopped using drugs until he found out she tested positive while pregnant with C.V.L. Father admitted that Mother lived with Father and C.V.L. during C.V.L.'s first four months of life. Father maintained that he thought Mother was allowed to live there because she was always in Father's or his family's supervision. After C.V.L. was four months old, Mother "took off for eight months" until the summer of 2017 when he and Mother began an off and on relationship. They would meet in hotels while C.V.L. was being watched by someone else. Father would not allow Mother to be around C.V.L. at that time because she was "heavily doing methamphetamines." Father understood that the Department took C.V.L. away from him in October 2017 because he "popped positive for methamphetamine." His explanation for why he testified positive for methamphetamines was "I slipped up." Father

–5–

maintained the October 2017 positive test result was from a one-time-only use when he got the drugs from Mother and smoked them with her outside of his house. He testified that was the first time he had used methamphetamines. In Father's opinion, "That means I'm a user not an abuser, not a – I'm not an addict, but I am an addict, I guess."

During the summer of 2018, Father was in contact with Mother for about two months after C.V.L. was returned to Father during the monitored return. Father and Mother would meet at motels or other places away from home and have sex when C.V.L. was at day care. But Father testified Mother was never around C.V.L. during that time, maintained he no longer had contact with Mother at the time of trial, and denied still being in a relationship with Mother. He testified that he stayed in the relationship in the past because he "has a big heart and, you know, she's the mother of my child." But he loves his child and "didn't want this for my child" and that is why he has continued going to the classes and done what the court and the Department have ordered and asked him to do. Father never missed a supervised visit with the child and was only late one time due to traffic on the expressway.

Father maintained at trial that he only used methamphetamines once in his life, and that use occurred in 2017 outside of his home with Mother. He believes that the positive drug test results in 2018 and 2019 were the result of coming into contact with drugs. Specifically, Father told the court that he came in contact with several methamphetamine pipes and crack pipes in a van in which he was installing a GPS system at work. He believed that by spending several hours in the van, the drug residue from the pipes contaminated him, which resulted in the positive drug tests in September 2018 and October 2018. He also testified that he had engaged in sexual intercourse with Mother during the summer of 2018 during a time that Mother was using methamphetamines. Father argued that the positive test results were caused by contamination from those sexual encounters.

The Department presented expert testimony to rebut Father's single-use explanation and contamination-by-contact theories. Chris Turnage, Toxicologist and Managing Director of Forensic DNA and Drug Testing Services, first explained what the different tests measured and then discussed Father's results. Urine tests are used to test for the presence of the evidence of drugs in the system for the prior two to four days. The test looks for "the evidence of the metabolite of any illegal substances or prescriptions in their system." A negative result is indicative of somebody that had not used the tested-for substance in the prior two to four days "assuming the sample was not diluted." Testing head hair detects drugs ingested in the past three months, while testing body hair detects drugs ingested in the past seven to twelve months. The window of detection for toenails is eight to twelve months. Turnage emphasized, however, that anything consumed in the two to three weeks before a nail or hair test will not show up in those tests because the drugs have not had enough time to make it into the sample at that point. Also, the detection windows depend on the growth rate of the individual's hair or nails.

After reviewing the test results from Father's samples, Turnage concluded that the test results indicated at least two separate incidents of drug usage by Father. First, Turnage opined that the October 2017 positive hair test shows use in the three months prior to October 2017. That test was positive for methamphetamines at a level of 6119, which according to Turnage is indicative of somebody that used the drug recreationally. He stated that the subject "may not be daily users, but they have it when they have it readily available at a party or hanging out with friends on the weekends or just when they're able to get their hands on it." Second, Turnage believed the September 25, 2018 positive hair test indicated a new use that would go back ninety days, with a window of detection from June 2018 through September 11, 2018.

The two toenail tests (October 23, 2018 and March 5, 2019) showed methamphetamine consumption during timeframes that overlapped at least the window of detection for the September

25, 2018 positive hair test and possibly for the October 2017 hair test. Turnage agreed that the October 23, 2018 positive nail test result, which was positive for two different classes of drugs, amphetamines and cannabinoids, could potentially be detecting use from 2017 that was also detected in the October 2017 hair sample. Turnage concluded without question that the March 5, 2019 positive nail test showed that methamphetamines were consumed at some point in time within a maximum window of detection from March 5, 2018 (twelve months before the test) to approximately February 19, 2019 (two weeks before the test). That window of detection, therefore, overlapped the window covered by the September 25, 2018 positive hair test. Turnage, therefore, concluded that the results showed at least two separate incidents of drug usage by Father, once in the three months prior to October 2017 and once between early June 2018 and September 11, 2018.

Turnage also testified that the 2018 and 2019 positive test results could not be caused by contact or environmental exposure. To the extent the exposure occurred in the two weeks prior to the date of collection, such exposure was not covered or tested in a hair or nail sample because it had not yet had enough time to go into the system to be tested. Moreover, Turnage testified that just being inside a vehicle that had methamphetamine pipes inside for a few hours would not be enough to show positive for environmental exposure:

> Q. So a one-time, one-day intersection with an environment that had meth located in it, so like used pipes or other things around it, would you expect that to produce any type of a positive read on any test?
>
> A. No.

Turnage also confirmed that having sexual intercourse with an active user would not result in the non-user testing positive because it would take a scientifically impossible amount of exchange of bodily fluids to read positive results.

Shetara Bonds, the Department caseworker assigned to C.V.L.'s case from December 2017 through March 2018, also testified at length. Bonds confirmed that Father completed the IOP and

SOP programs through Metrocare. But she expressed concern that completing those programs would not prevent a relapse because Father had completed drug treatment programs in the past but then tested positive for the same substances – methamphetamines – again. Even though Father completed the Metrocare services, Bonds told the court that the Department was still seeking to terminate his parental rights because "he doesn't acknowledge the drug use or the main concern of the Department which is the drug use. So, we're kind of like how is he completing the services successfully if he doesn't acknowledge that the problem exist[s]." She noted that, even if the Department believed that Father has stopped using, that did not change its opinion regarding termination because Father has never admitted to actively using. Bonds conceded on cross-examination, however, that Father admitted prior drug use during his trial testimony.

Bonds confirmed that the Department's position is that Father's parental rights should be terminated based on drug usage and the potential of future drug usage. Bonds acknowledged that there is a tremendous bond between Father and child, and she did not see Father intentionally putting the child in danger. However, Bonds believed there was the possibility that the child will be put in danger if Father continued to use drugs. Bonds described the danger to C.V.L. as Father's "history with drug use, him not acknowledging his drug use, the possibility of there being another return and the same pattern continues. That's pretty much the gist of it." She stated that she fears for the safety of the child "based on what the experience has been since this case has been open."

John Parker, Lorrie Al-Bohi, and Ronald Aland each testified favorably for Father. Parker has known Father since 2006 and considers Father a good friend. He and Father currently talk every day and spend a lot of time at Father's house. After C.V.L. was born, however, he did not spend much time with Father and, until August 2018, Parker just saw Father in passing. They reconnected at a family birthday party in August 2018. Parker testified that he has never known Father to use drugs, and he does not think Father is using drugs now because Father seems the

same now as he has always seemed. Although Parker drinks socially, he does not do drugs and he does not drink when he is out with Father. He thinks Father is up to the task of raising C.V.L. Father and C.V.L. love each other, and Father wants C.V.L. back more than anything. Parker also knows Mother. He knows Mother is a drug user because she admitted her drug use before C.V.L. was born. Parker believes Mother is bad for Father, and it was his understanding that as of August 2018, Mother and Father were no longer together.

Al-Bohi is a family friend who has known Father for more than twenty years. Al-Bohi was C.V.L.'s babysitter two to three times a week since C.V.L.'s birth. She testified that she is available to take care of C.V.L. on a regular basis or in emergencies if the child is returned to Father. Al-Bohi testified that she misses C.V.L., loves her, and believes she is capable to take care of C.V.L. Al-Bohi also stated that she does not believe that Father tested positive for drugs. Al-Bohi agreed that Father needed to go through family counseling because he had a bad relationship with Mother and Mother has a drug problem. She further acknowledged that she did not know that Father had continued a sexual relationship with Mother into the summer of 2018. She agrees that if Father is hanging around Mother and having sex with her repeatedly when she is using, it shows questionable judgment on his part. It was Al-Bohi's understanding that Father cut off all contact with Mother five or six months before trial after Mother retrieved her belongings from Father's house.

Aland is the child's guardian ad litem. In addition to questioning witnesses at trial, he also told the trial court that he recommended C.V.L. be returned to Father. Aland told the trial court that Father "is a really good person" who "deserves this chance to get his child back" even though this is Father's second or third chance. Aland's view was that Father plays with C.V.L. during visits, cares about her appearance and cleanliness, has admitted his mistakes, and "is facing his demons." Based on those factors, Aland recommended the trial court return C.V.L. to Father.

The CASA representative did not provide a clear recommendation. The representative told the court that the representative was "torn on this one" because although the representative thinks Father is a great father, the CASA representative still had "an issue with the drug use."

**VI.       The Decree of Termination**

After hearing the evidence, the trial court granted the Department's petition. The final decree terminated both Mother's and Father's parental rights and appointed the Director of the Dallas County Child Protective Services Unit of the Texas Department of Family and Protective Services as C.V.L.'s permanent managing conservator. The trial court terminated Father's parental rights to C.V.L. under sections 161.001(b)(1)(D) and (E) of the family code. The trial court further found that the terminations of Mother's and Father's parental rights were in C.V.L.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Father timely appealed. The Court granted each party one extension of time to file their opening briefs and submitted the case for decision without oral argument on October 3, 2019.

**Standard of Review**

Because the fundamental liberty interest of a parent in the care, custody, and control of his child is one of constitutional dimensions, involuntary parental termination must be strictly scrutinized. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000); *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). In parental termination cases, due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982)). "Clear and convincing evidence" is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019)

(per curiam) (quoting TEX. FAM. CODE ANN. § 101.007); *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.).

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas 2013, pet. denied). "As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). Under both legal and factual sufficiency standards, we (i) consider all the evidence, (ii) defer to the factfinder's credibility determinations, and (iii) determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re N.T.*, 474 S.W.3d at 475; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d at 630–31.

In conducting a legal-sufficiency review of an order terminating parental rights, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *Id.* at 630–31. We "consider all the evidence, not just that which favors the verdict," and we assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *In re N.T.*, 474 S.W.3d at 475. We disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id.*

When reviewing the factual sufficiency of the evidence supporting a termination finding, an appellate court asks whether, in light of the entire record, the evidence is such that a fact-finder could reasonably form a firm conviction about the truth of the State's allegations against the parent. *In re N.T.*, 474 S.W.3d at 475; *In re J.D.B.*, 435 S.W.3d 452, 463 (Tex. App.—Dallas 2014, no

pet.). Further, the appellate court must consider whether the disputed evidence is such that a reasonable fact-finder could not have reconciled that disputed evidence in favor of its finding. *Id.* If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* "And in making this determination, the reviewing court must undertake 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *In re A.B.*, 437 S.W.3d at 503 (quoting *In re C.H.*, 89 S.W.3d at 26).

## Discussion

"Texas Family Code section 161.001(b) allows for involuntary termination of parental rights if clear and convincing evidence supports that a parent engaged in one or more of the twenty-one enumerated grounds for termination and that termination is in the best interest of the child." *In re N.G.*, 577 S.W.3d at 232. Here, the trial court terminated Father's rights under two grounds—sections 161.001(b)(1)(D) and (E)—in addition to finding that termination was in C.V.L.'s best interest. In two issues, Father challenges the legal and factual sufficiency of the evidence supporting the grounds for termination and the finding that termination was in C.V.L.'s best interest. We address each issue in turn.

## I. Termination Under Sections 161.001(b)(1)(D) and (E)

In his first issue, Father argues that the evidence is legally and factually insufficient to support the trial court's finding that he endangered C.V.L. under subsections 161.001(b)(1)(D) and (E) of the family code.

### A. Applicable Law

Under section 161.001(b)(1)(D), parental rights may be terminated if clear and convincing evidence supports a finding that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the

child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Section 161.001(b)(1)(E) allows for termination of parental rights if clear and convincing evidence supports a finding that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

Because an order terminating a parent's rights under subsection (D) or (E) can be used as a basis to terminate the parent's rights to another child under subsection 161.001(b)(1)(M), terminating rights under (D) or (E) has "significant" collateral consequences. *In re N.G.*, 577 S.W.3d at 234; TEX. FAM. CODE ANN. § 161.001(b)(1)(M). Therefore, "due process requires an appellate court to review and detail its analysis as to termination of parental rights under section 161.001(b)(1)(D) or (E) of the Family Code when challenged on appeal." *In re Z.M.M.*, 577 S.W.3d 541, 543 (Tex. 2019) (per curiam).

Subsections (D) and (E) both require proof of endangerment. "Endanger" means to expose to loss or injury or to jeopardize a child's emotional or physical health, but it is not necessary that the conduct be directed at the child or that the child actually suffer an injury. *In re J.D.B.*, 435 S.W.3d at 463. The primary distinction between the two subsections is the source of the physical or emotional endangerment to the child. *Id.* Subsection (D) addresses the child's surroundings and environment while subsection (E) addresses parental misconduct. *Id.* Parental conduct, however, is also relevant to the child's environment under subsection (D). *Id.* That is, "[c]onduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D)." *Id.* at 464 (quoting *Castaneda v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 509, 522 (Tex. App.—El Paso 2004, pet. denied)). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id.* (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) ("A child

is endangered when the environment creates a potential for danger that the parent is aware of but disregard.")); *see also In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) ("environment" refers not only to the acceptability of the living conditions but also to a parent's conduct in the home).

Ground (E) "refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied). "Termination under section 161.001(b)(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re K.S.*, No. 05-15-01294-CV, 2016 WL 1613126, at *14 (Tex. App.—Dallas Apr. 21, 2016, pet. denied) (mem. op.) (internal quotations omitted). In determining whether a parent engaged in a course of "endangering" conduct, a trial court may consider conduct that occurred before and after the child's birth, in the child's presence and outside the child's presence, and before and after removal by the Department. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

While endangerment often involves physical endangerment, the statute does not require that the conduct be directed at the child or that the child actually suffers injury. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Id.* A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc). Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it. *In re C.J.B.*,

No. 05-19-00165-CV, 2019 WL 3940987, at *6 (Tex. App.—Dallas Aug. 21, 2019, no pet. h.) (mem. op.) (citing *In re J.T.G.*, 121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.)).

### B.       Application of Law to Facts

The trial court found that Father committed the conduct defined in sections 161.001(b)(1)(D) and 161.001(b)(1)(E) by testing positive for methamphetamine use at a level showing recreational use during the summer of 2018 when the child was in his possession. Evidence of a parent's drug use, or evidence that another parent allowed a child to be around a parent or other persons using drugs, can support the conclusion that the child's surroundings endanger her physical or emotional well-being under subsection (D) and can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being under subsection (E). *See In re S.R.*, 452 S.W.3d 351, 361–62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *see also In re J.T.G.*, 121 S.W.3d at 125–26. Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under subsection (E). *Cervantes-Peterson*, 221 S.W.3d at 253–54. "And where the record contains evidence that a parent engages in drug use during the pendency of a termination suit, when he knows he is at risk of losing his children," such evidence has been found legally sufficient to support a finding of endangerment under subsection (E). *See In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at *4 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.).

Here, Turnage testified that the positive drug tests indicated drug use by Father on at least two separate occasions: one use was the October 2017 use to which Father admitted; the second use occurred between early June 2018 and September 11, 2018, which was either just before or during the time in which C.V.L was in Father's care or after her removal. Considering all the evidence, a factfinder reasonably could have inferred that Father used illegal drugs during the time

–16–

in which the child was in his care in the summer of 2018 or, at a minimum, during the pendency of this suit. Therefore, the evidence is legally sufficient to support a finding of endangerment because illegal drug use after a child's removal or during the pendency of a termination proceeding is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under subsection (E). *See In re D.D.M.*, 2019 WL 2939259 at \*5; *see also Cervantes-Peterson*, 221 S.W.3d at 253–54.

Under this record, however, we conclude the evidence of Father's drug use does not constitute factually sufficient evidence to support a finding of endangerment under either subsection (D) or (E). "In a termination suit, acts done in the distant past, without showing a present or future danger to a child, cannot be sufficient to terminate parental rights." *In re C.E.K.*, 214 S.W.3d 492, 496 (Tex. App.—Dallas 2006, no pet.). Although illegal drug use and drug-related criminal activity by parents and caregivers may create an environment that endangers a child's physical or emotional well-being, a finding of endangerment based on drug use alone is not automatic. *See In re D.C.*, 128 S.W.3d 707, 715–16 (Tex. App.—Fort Worth 2004, no pet.). The party seeking termination must still present clear and convincing evidence of the child's actual physical surroundings or conditions that were created by the endangering conduct to satisfy the requirements of subsection (D) and must show a continuing course of conduct to satisfy the requirements of subsection (E). *See, e.g., In re J.O.A.*, 262 S.W.3d 7, 15–16 (Tex. App.—Amarillo 2008), *aff'd as modified and remanded*, 283 S.W.3d 336 (Tex. 2009); *see also In re D.J.H.*, No. 04-11-00668-CV, 2012 WL 3104502, at \*6 (Tex. App.—San Antonio Aug. 1, 2012, no pet.) (mem. op.) (fact finder could conclude parent's pattern of criminal activity subjected him to possibility of incarceration, thereby negatively affecting child's living environment and emotional well being).

For example, in *J.O.A.*, the evidence showed that father tested positive for marijuana use the month before trial, missed a drug screening scheduled between two separate hearings making up the trial, and was delinquent on his child support. The evidence also showed father had steady employment, a better car and house than before the proceedings, daycare available for the child, was attending parenting classes, and had three negative drug tests. *Id.* The *J.O.A.* court concluded the evidence was legally and factually insufficient to support the predicate finding of conduct endangering the children:

> While Timothy was hardly the ideal father, based upon this record, we cannot say that a reasonable and rational factfinder could have formed a firm belief or conviction that Timothy engaged in conduct which exposed T.J.M. or C.T.M. to loss or injury and jeopardized the children's emotional and physical well-being because there is insufficient evidence of Timothy's continued drug use, subsequent incarceration, or other anti-social behavior.

*Id*. at 24.

Similarly, in *In re A.G.K.*, No. 04-16-00315-CV, 2016 WL 6775590 (Tex. App.—San Antonio Nov. 16, 2016, no pet.) (mem. op.), the court concluded that evidence of the mother's past drug use could not support termination where the Department presented no evidence that her use of drugs endangered the child and the undisputed evidence showed mother had since rehabilitated herself and remained drug free. Because "there is no evidence that drug use remains a current or future threat to the children, Frances's drug use in 2009 does not support termination." *See id.*

Here, the Department presented factually insufficient evidence that Father's past use of methamphetamines endangered C.V.L. This is not a case in which the Department alleged that Father used drugs in the child's presence, left the child in the care of drug users or in a home where drugs were present, or was ever arrested or incarcerated for drug possession. The Department relied solely on Father's positive drug tests to support the termination. Under this record, we conclude that no reasonable fact finder could form a firm belief or conviction that Father's past drug use knowingly placed or knowingly allowed C.V.L. to remain in conditions or surroundings that

endangered her physical or emotional well-being. *See In re J.F.C.*, 96 S.W.3d at 266; *see also In re A.S.*, 261 S.W.3d 76, 83–85 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Therefore, we hold that the evidence is factually insufficient to terminate father's parental rights pursuant to subsection (D).

The same is true under subsection (E). While unquestionably an exercise of poor judgment, Father's use of methamphetamines on two occasions, standing alone, does not rise to the level of a conscious course of conduct. *See Ruiz v. Tex. Dep't of Family & Protective Servs.*, 212 S.W.3d 804, 818 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (noting termination under subsection (E) must be based on more than single act or omission); *In re S.M.L.*, 171 S.W.3d at 477 (same); *In re J.T.G.*, 121 S.W.3d at 125 (same); *In re J.F.C.*, 96 S.W.3d at 266. Therefore, we hold that the evidence is factually insufficient to terminate Father's parental rights pursuant to subsection (E).

We sustain Father's first issue on factual insufficiency grounds.

## II.     Best Interest of the Child

In addition to the findings under section 161.001(b)(1) of the family code, the trial court also determined that termination of the parent–child relationship was in the best interest of C.V.L. In his second issue, Father argues the evidence is legally and factually insufficient to support this finding.

### A.     Applicable Law

A judicial determination of the "best interest" of a child "is not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm." *In re M.J.P.*, No. 05-16-01293-CV, 2017 WL 655955, at *6 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op.). Rather, "best interest" is "a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *Id.* (quoting *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (orig. proceeding)); *see also In re C.R.*, 263 S.W.3d 368,

375 (Tex. App.—Dallas 2008, no pet.) ("[P]arental rights may not be terminated merely because a child might be better off living elsewhere.").

The supreme court has identified nine factors that may assist our review of a best-interest finding:

> (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the person seeking custody; (5) the programs available to assist the person seeking custody in promoting the best interest of the child; (6) plans for the child by the person seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors focus on the best interest of the child, not the best interest of the parent, and are not exhaustive. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ); *In re C.H.*, 89 S.W.3d at 27.

A best interest finding need not be supported by evidence of every *Holley* factor, particularly if there is undisputed evidence that the parental relationship endangered the child's safety. *See In re C.H.*, 89 S.W.3d at 27. Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *D.M. v. Tex. Dep't of Family & Protective Servs.*, No. 03-17-00137-CV, 2017 WL 2628949, at *4 (Tex. App.— Austin June 13, 2017, no pet.) (mem. op.). On the other hand, the presence of scant evidence relevant to each factor will generally not support such a finding. *In re C.H.*, 89 S.W.3d at 27. Further, the same evidence can be relevant to both section 161.001(b)(1) termination grounds and the child's best interest. *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied).

In addition, the Texas Family Code sets out factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. TEX. FAM. CODE ANN. § 263.307(b); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (citing family code section 263.307

and *Holley* as containing factors to consider "when determining whether termination of parental rights is in the best interest of the child"). The statutory best interest factors include the following:

> (1) the child's age and physical and mental vulnerabilities; … (3) the magnitude, frequency, and circumstances of the harm to the child; … (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; … (8) whether there is a history of substance abuse by the child's family; … (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills …; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child.

TEX. FAM. CODE ANN. § 263.307(b)(1)–(13).

Although courts may consider any other factor relevant to the child's best interest, there is "[a] strong presumption . . . that a child's best interests are served by preserving the parent-child relationship, where possible." *In re D.D.M.*, 2019 WL 2939259, at *5 (quoting *Burns v. Burns*, 434 S.W.3d 223, 230 (Tex. App.—Houston [1st Dist.] 2014, no pet.)); *In re R.R.*, 209 S.W.3d at 116 ("there is a strong presumption that the best interest of a child is served by keeping the child with a parent").

### B. Application of Law to Facts

Our analysis of the entire record is guided by the *Holley* factors. We will, therefore, address the evidence through the lens of those factors.

#### 1. The child's desires, age, and emotional and physical needs now and in the future.

The first *Holley* factor, the child's desires, is generally considered neutral where, as here, the child did not testify due to her young age. *See In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.— Houston [1st Dist.] 2012, no pet.) ("The young age of the child render[s] consideration of the child's desires neutral."). There is evidence in this record, however, weighing against termination.

For example, Father did not miss a single, supervised visit with C.V.L. during the underlying proceedings, and the trial judge and multiple witnesses agreed that Father loves his child and has worked hard to do what he needed to do to get her back. The guardian ad litem and Bonds, both of whom supervised Father's visits with the child, described the child as having a very strong bond with Father and vice versa. The CASA representative assigned to the case described Father as "a great father." In light of this testimony, and the lack of any evidence indicating that the child did not want to be placed with Father, this factor weighs against termination under the legal- and factual-sufficiency standards of review and in favor of maintaining the parent–child relationship. *See In re D.D.M.*, 2019 WL 2939259, at \*5.

The second *Holley* factor is the child's current and future physical needs. Evidence of this factor generally demonstrates what the child's physical needs are, specifically any special physical needs, and whether the parent seeking custody was willing and able to meet those needs. *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012). There was no evidence presented that the child had any physical needs aside from the basics such as housing and sustenance. Father testified that he has a full-time job in which he works 9 a.m. to 6 p.m. Monday through Saturday. He lives in a four-bedroom house with his father, and C.V.L. has her own room in the house. Father planned to enroll C.V.L. in day care or have Al-Bohi babysit C.V.L. while he was at work, and he had the means to ensure the child would have adequate food, clothing, and shelter and would have something to do or be watched twenty-four hours a day. Father testified that he had developed a good support system of friends around him, and he has friends that can take care of C.V.L. if he or the babysitter cannot watch her.

Nevertheless, under a legal-sufficiency review, we must presume that the trial court disbelieved Father's testimony that he could meet his child's physical needs. *See In re A.S.*, 261

S.W.3d at 87. Accordingly, under a legal-sufficiency review, this factor weighs in favor of termination.

Under a factual-sufficiency review, however, we must consider all of the evidence. *In re N.T.*, 474 S.W.3d at 475. In light of Father's testimony that he had the means and willingness to meet C.V.L.'s physical needs, and the lack of any evidence indicating that the child had any unique physical need or any physical need that would be unmet if the child was in Father's care, this factor weighs against termination under a factual-sufficiency review. *See In re E.N.C.*, 384 S.W.3d at 808 ("As to the second *Holley* factor, the court of appeals stated that the children's emotional and physical needs are great, but did not explain or cite any evidence illuminating how those needs differ from other children or would go unmet if the children were with [the father]. As such, we disagree that this factor weighs in favor of termination.").

### 2. Father's drug use and the remaining *Holley* factors

Here, the trial judge made findings on the record at the termination hearing. She stated that "the fact that [Father] is testing positive for methamphetamine is the issue" and Father's positive test results for methamphetamines during the time that C.V.L. was in his possession in the summer of 2018 violates the court's orders, the mediated settlement agreement, and shows continuing behavior that supports termination. Based solely on the positive drug tests showing use during the window of detection when he had possession of C.V.L. in June 2018, the trial judge determined that termination was in the best interest of the child. Similarly, the Department focused its case and termination request on those positive test results. The remaining *Holley* factors tie together and relate to the basis for the court's termination. We, therefore, discuss those factors collectively.

Bonds testified that the Department's position is that termination is in the child's best interest based on Father's past drug usage and the potential of future drug usage. Bonds noted that, even though Father completed the services ordered following both referrals, the Department still

sought to terminate his parental rights because he did not acknowledge drug use to the Department and the Department is concerned about the potential for relapse based on Father's history. Overall, Bonds testified that, based on Father's history, she does not believe him if he says he is never going to use again. The Department presented no evidence, however, to support Bonds's belief that Father had relapsed or would relapse in the future. Further, the Department did not controvert the testimony of John Parker or Lorrie Al-Bohi, who each testified that Father was not using drugs, was capable to taking care of and providing for his daughter, was no longer in contact with Mother, and had a strong bond with the child. Similarly, the Department did not deny that Father had the financial means to provide for his daughter and that he would provide an acceptable home and living conditions for her. The Department also did not question the guardian ad litem as to his opinion that termination was not in the child's best interest. Instead, the Department focused solely on Father's past drug use, of which the Department conclusively proved, at most, only two instances through Turnage's testimony.

Although we agree that Father's drug use is some evidence that weighs in favor of the best-interest finding, a factor we carefully consider in reaching our conclusion, we cannot ignore all the other evidence and base our holding solely on evidence of drug use. Both legal and factual sufficiency review of a decree terminating parental rights require a reviewing court to consider all the evidence to determine whether the fact-finder could reasonably form a firm belief or conviction that the grounds for termination are proven. *In re N.T.*, 474 S.W.3d at 475 (citing *In re J.D.B.*, 435 S.W.3d at 462 (citing *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002))); *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (holding that court of appeals erred in reversing termination on factual sufficiency grounds by focusing on one pertinent factor "[r]ather than weighing all of the evidence" and "not fully account[ing] for evidence that supported the jury's verdict").

Under a legal–sufficiency standard, we must view the evidence in the light most favorable to the finding, assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so, and disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *In re N.T.*, 474 S.W.3d at 475. Here, the majority of the evidence weighs against termination under the remaining *Holley* factors—including the uncontroverted testimony of Father, Al-Bohi, and Parker concerning Father's clean lifestyle, ability to provide for and care for C.V.L., and his bond with the child. Father's testimony regarding his willingness to continue counseling services, to cooperate with agency supervision, and to remain drug-free, however, could properly be categorized as disputed evidence because Bonds told the trial court she did not believe Father and, under the legal-sufficiency standard, we must presume that the trial court disbelieved Father's testimony. *See In re A.S.*, 261 S.W.3d at 87. Applying that high standard of review, we overrule Father's contention that the evidence was legally insufficient to support the trial court's finding that termination would be in the child's best interest.

Under the factual-sufficiency standard, however, we must ask whether, in light of the entire record, the evidence is such that a fact-finder could reasonably form a firm conviction about the truth of the State's allegations and must consider whether the disputed evidence is such that a reasonable fact-finder could not have reconciled that disputed evidence in favor of its finding. *In re N.T.*, 474 S.W.3d at 475. If, in light of the entire record, the disputed evidence that weighs against termination is so significant that a fact-finder could not reasonably have formed a firm belief or conviction that termination was justified, then the evidence is factually insufficient to support termination. *Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 244 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A court of appeals should detail in its opinion why it

has concluded that a reasonable fact-finder could not have credited disputed evidence in favor of termination. *Id.*

Under this record, we conclude the evidence is factually insufficient to support the best interest determination because, in light of the entire record, the evidence that weighs against termination is so significant that a fact-finder could not reasonably have formed a firm belief or conviction that termination was justified. That evidence, which included the testimony of Parker, Al-Bohi, the guardian ad litem, and Father, shows that Father completed all of the services required of him by the Department and the court, continued attending N.A. meetings and maintained his sobriety at the time of trial, and had taken many positive steps to create a support system around himself away from Mother and the negative influences of drugs and alcohol. As this Court noted more than two decades ago, while "we acknowledge that drug and alcoholic homes do not provide good environments for children, . . . it is not the State's role to remove children from their parents simply because they live in a 'less than ideal' family environment. It is only when such environments or the parents' conduct endanger the children, and the danger is proven by clear and convincing evidence, that termination is warranted." *Michael C. v. Tex. Dep't of Protective & Regulatory Servs.*, No. 05-96-01867-CV, 1998 WL 209055, at *21 (Tex. App.—Dallas Apr. 30, 1998, pet. denied) (not designated for publication) (internal citations omitted). Here, the evidence shows no more than the threat of an abstract injury.

The dissent takes issue with our consideration and weighing of all of the evidence when conducting this sufficiency review. As the Texas Supreme Court has reminded us, however, such an exacting review is constitutionally required:

> A factual sufficiency review pits two fundamental tenets of the Texas court system against one another: the right to trial by jury and the court of appeals' exclusive jurisdiction over questions of fact. And, in the context of parental termination cases, a third interest must also be accounted for—that is, parents' fundamental right to make decisions concerning "the care, the custody, and control of their children."

Thus, in *In re C.H.*, we articulated a factual sufficiency standard to strike an appropriate balance between these competing principles.

Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial. Given this higher burden at trial, in *C.H.* we concluded a heightened standard of appellate review in parental termination cases is similarly warranted. Specifically, a proper factual sufficiency review requires the court of appeals to determine whether "the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." And in making this determination, the reviewing court must undertake "an exacting review of the entire record with a healthy regard for the constitutional interests at stake."

*In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014) (internal citations omitted); *see also In re J.O.A.*, 283 S.W.3d 336, 347 (Tex. 2009) ("Weighing conflicting evidence and inferences to determine whether a verdict should be vacated as manifestly unjust is appropriately a part only of the reviewing court's factual sufficiency review, a matter committed under the Texas Constitution to the courts of appeals and not to this Court. TEX. CONST. art. V, § 6.").

Here, evidence that Father used methamphetamines twice during the underlying proceedings and Bonds' unsubstantiated belief that Father will use drugs again in the future because he used drugs twice in the past is not enough under a factual sufficiency review to permanently deprive Father and child of a relationship when weighed against all of the contrary, uncontroverted evidence presented at trial and the strong presumption that a child's best interests are served by maintaining the parent–child relationship.

We recognize that we must give due deference to the trial court's factual determinations. *See In re C.H.*, 89 S.W.3d at 26. However, the overwhelming weight of the evidence, mostly through uncontroverted testimony from objective, disinterested witnesses, was that it is in the child's best interest for Father to maintain his rights to C.V.L. The only evidence to the contrary was Bonds's testimony that termination would be preferable and Father's past drug use. Under the

elevated clear-and-convincing standard of review, when we consider the balance of the evidence, we can only conclude that the evidence is factually insufficient to support the trial court's best-interest determination here. *See In re C.E.K.*, 214 S.W.3d at 503–04 (mother exhibited poor parenting in past and CASA volunteer criticized mother's behavior, but record showed mother had "done everything that CPS has required of her and more," had made progress and improvements, and cared for children; "The best interest standard does not permit termination merely because a child might be better off living elsewhere."); *see also In re J.N.*, 301 S.W.3d 429, 434–35 (Tex. App.—Amarillo 2009, pet. denied) ("[W]e can see no compelling benefit that would be gained by severing the bond that exists between Bradford and the child at this time, especially in light of the Department's current plans to attempt to place the child with her biological father. As the evidence establishes that Bradford poses no threat to the child during supervised visits and since the Department's goal of providing the child stability and permanence through adoption cannot currently be accomplished, we cannot see how the finder of fact could form a firm belief or conviction that the drastic act of termination would be in the best interest of the child." (citations omitted)); *Gibbs v. Texas Dep't of Family & Protective Servs.*, No. 03-11-00320-CV, 2012 WL 2979048, at *12 (Tex. App.—Austin July 19, 2012, no pet.) (mem. op.).

There is no evidence or suggestion in the record that Father engaged in assaultive conduct or ever intentionally placed C.V.L. in danger. Moreover, there is no evidence or suggestion in the record that Father ever used drugs in the presence of C.V.L. or allowed C.V.L. to be in a location where drugs were present. Father lives in a four bedroom home with his own father, has a bedroom decorated and designated for C.V.L., and maintains a full-time job with which he can provide C.V.L. with the necessities of life. Father also has friends in his life like Parker, Parker's wife, and Al-Bohi who are willing and able to watch C.V.L. when Father is at work or in the event of an emergency. Further, the caseworker testified that she visited Father's home and did not see

anything that would be dangerous for the child. Father testified that he would do anything to get his daughter back, and he demonstrated this by completing the service plan, attending every visit, and continuing his counseling. Finally, each witness who knew Father and the child testified that they have a strong bond and Father is a loving and caring father. Even the trial judge acknowledged this when making her findings on the record. Yet, just seconds later, the judge terminated this Father's parental rights forever based solely on evidence of past drug use.

The dissent's application of the standard of review effectively eliminates factual sufficiency review of termination orders in the intermediate appellate courts by conflating it with legal sufficiency review. Such a change would undermine the fundamental liberty interests at stake in the appeal of parental termination orders and is, thus, not a change this Court has the authority to make. *Se*e TEX. CONST. art. 5, § 6(a).

In light of the constitutional concerns related to parental termination, clear instructions from the supreme court to strictly scrutinize termination proceedings and strictly construe involuntary-termination statutes, the strong presumption that preservation of the parent–child relationship is in the child's best interest, the absence of evidence that Father would not meet his child's needs, and our obligation under a factual-sufficiency review to consider all evidence, we conclude that the record evidence does not permit a reasonable factfinder to form a firm belief or conviction that termination of Father's parental rights would be in C.V.L.'s best interest. *See In re C.E.K.*, 214 S.W.3d at 504 (reversing termination of mother's parental rights because evidence was legally insufficient to support best interest finding); *see also In re D.D.M.*, 2019 WL 2939259, at * 8 (evidence, including evidence of drug use, factually insufficient to support best interest finding). We therefore sustain Father's issue that the evidence is factually insufficient to support a finding that termination is in his child's best interest.

**III.      Conservatorship**

In the decree of termination, the trial court appointed the Director of the Dallas County Child Protective Services Unit of the Texas Department of Family and Protective Services as C.V.L.'s permanent managing conservator. Father did not separately challenge the appointment of the Department as permanent managing conservator. Rather, he prays for this Court to reverse the order terminating his parental rights and to remand the matter to the trial court for further proceedings. This raises the question of whether we may reverse that appointment order. We conclude that we must.

If the trial court orders termination, section 161.207 provides a mechanism to designate the Department as managing conservator of the child. TEX. FAM. CODE ANN. § 161.207(a); *In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008) (per curiam). When that order of termination is reversed, section 161.207 will not support the Department's conservatorship. *See In re D.N.C.*, 252 S.W.3d at 319. The question then becomes whether (1) the Department has pleaded alternative grounds for appointment as conservator and (2) the trial court has entered findings supporting appointment under those alternative grounds. *See id.*; *see also In re A.S.*, 261 S.W.3d at 92–93. If there are no findings on alternative grounds, then reversal of the Department's appointment is required. *See In re D.N.C.*, 252 S.W.3d at 319. Reversal is required regardless of whether the appointment is specifically challenged on appeal because the challenge is subsumed in the appeal of the termination order. *In re A.S.*, 261 S.W.3d at 92–93. Here, the trial court entered no findings. As such, reversal of the Department's appointment is also required.

**Conclusion**

Accordingly, after reviewing all the evidence under the appropriate standard of review, we reverse the portion of the trial court's decree of termination that terminated Father's parental rights to C.V.L., reverse that portion of the decree appointing the Department as the permanent managing

conservator of C.V.L., and remand the case to the trial court for a new trial to commence no later than 180 days after the mandate is issued by this Court. *See* TEX. R. APP. P. 28.4(c); *see also* TEX. FAM. CODE ANN. § 161.205; *In re J.O.A.*, 418 S.W.3d 625, 626 (Tex. App.—Amarillo 2009, no pet.); *In re A.S.*, 261 S.W.3d at 93; *In re Yonko*, 196 S.W.3d at 249. We order the trial court to conduct further proceedings and enter temporary orders regarding Father and the subject child consistent with this opinion within ten days of the date of this opinion. *See* TEX. R. APP. P. 43.6.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

Whitehill, J., dissenting

190506F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF C.V.L., A CHILD, Appellant

No. 05-19-00506-CV          V.

On Appeal from the 304th Judicial District Court, Dallas County, Texas
Trial Court Cause No. JC-17-01086-W.
Opinion delivered by Justice Partida-Kipness. Justices Whitehill and Pedersen, III participating.

In accordance with this Court's opinion of this date, the portion of the trial court's decree of termination that terminated Father's parental rights to C.V.L. is **REVERSED**, the portion of the trial court's decree appointing the Department as the permanent managing conservator of C.V.L. is **REVERSED**, and the case is **REMANDED** to the trial court for a new trial to commence no later than 180 days after the mandate is issued by this Court. We **ORDER** the trial court to, within ten days of the date of this judgment, conduct further proceedings and enter temporary orders regarding Father and the subject child consistent with the Court's opinion.

Judgment entered this 13th day of December 2019.